United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VITA GRAHAM,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

Defendant.
_____/

No. C 08-0729 PJH

**ORDER RE PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

Plaintiff Vita Graham ("Graham") seeks judicial review of the Commissioner's final

decision denying her disability benefits pursuant to 42 U.S.C. § 405(g).  This appeal is

before the court on the parties' cross-motions for summary judgment.  Having read the

parties' papers and administrative record and having carefully considered their arguments

and the relevant legal authority, the court GRANTS the Commissioner's cross-motion for

summary judgment and DENIES Graham's motion for summary judgment.

**BACKGROUND**

Graham applied for Social Security Disability Insurance Benefits on March 4, 2004,

alleging disability beginning on May 8, 2003.  She was insured through December 31,

2006.  Her application was denied both initially and upon reconsideration.  Graham filed a

request for a hearing, which was held before an administrative law judge ("ALJ") on

February 8, 2006, and was followed by a supplemental hearing on July 5, 2006.  The ALJ

rendered an unfavorable decision on September 28, 2006, denying Graham's application.

United States District Court

For the Northern District of California

Graham requested review by the Appeals Council, which denied review, therefore making the ALJ's decision final on November 27, 2007. Graham filed this action on January 31, 2008.

At the time of the ALJ's decision, Graham was forty-five years old. A.T. 16. She has a high school education and was formerly employed as a receptionist. A.T. 16.

According to Graham, she experienced rapid heartbeat, chest pain, and shortness of breath beginning in March 2001. A.T. 17. She had an episode on March 14, 2001, during which she lost consciousness in the parking lot after leaving work. A.T. 159-161. At that time, she was hospitalized and diagnosed with ventricular tachycardia.[1] A.T. 17. Graham received an implantable cardioverter defibrillator (ICD)[2] in her [left] shoulder area on March 22, 2001. A.T. 17. In June 2003, she developed anxiety and depression. A.T. 17. She visited a psychiatrist once in January 2004, who prescribed Ambien[3] and Lexapro.[4] A.T. 17-18. In 2005, she was diagnosed with type II diabetes mellitus,[5] without complications. A.T. 18.

Graham's alleged symptoms included "weakness, dizziness, diminished

---

[1] "Tachycardia" is defined as "Rapid beating of the heart, conventionally applied to rates over 90 beats per min." Stedman's Medical Dictionary 1931 (28th ed. 2006). "Ventricular tachycardia" is "paroxysmal tachycardia originating in an ectopic focus in the ventricle." Id.

[2] An implantable cardioverter defibrillator (ICD) is a device that monitors heart rhythms and delivers a shock when dangerous rhythms are detected. Many ICD devices record the heart's electrical patterns whenever abnormal heart rhythms are detected. See http://www.fda.gov/hearthealth/treatments/medicaldevices/icd.html (last visited Feb. 26, 2009). The American Heart Association provides a description of ICDs on its website, which can be found at http://216.185.112.5/presenter.jhtml?identifier=11227 (last visited Feb. 26, 2009).

[3] Ambien (generic name zolpidem) is a prescription drug used to treat insomnia. Ambien belongs to a class of drugs known as sedatives/hypnotics. See http://www.webmd.com/drugs/drug-9690-Ambien+Oral.aspx?drugid=9690&drugname=Ambien+Oral (last visited Feb. 26, 2009).

[4] Lexapro (generic name escitalopram) is a selective serotonin reuptake inhibitor (SSRI) indicated for the treatment of major depressive disorder and generalized anxiety disorder in adults. See http://www.lexapro.com/ (last visited Feb. 26, 2009).

[5] "Diabetes mellitus" is defined as "a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced." Stedman's Medical Dictionary 529 (28th ed. 2006). Type II diabetes usually develops in adults. Id. at 530.

United States District Court

For the Northern District of California

1  concentration, shortness of breath, rapid heartbeat, memory loss, lightheadedness,

2  'passing out,' heart palpitations, fatigue, and lethargy." A.T. 17.  Christopher Wulff, M.D., is

3  her treating physician. A.T. 17.  Her medications include Ambien, Lexapro, and an oral

4  diabetic medication. A.T. 17.  Graham testified at the initial hearing about side effects from

5  her medications, which she described as "dizziness, low energy, and fatigue." A.T. 18.

6  Graham testified that she could not return to her previous work because of the stress and

7  anxiety it would produce. A.T. 18.

8       The record includes treatment notes from the Cardiovascular Consultants Medical

9  Group covering the period from March 30, 2001, to September 30, 2004, as well as

10  treatment notes from Dr. Wulff, Graham's treating physician, covering the period from

11  December 14, 2004, to February 2, 2006. A.T. 269-319; A.T. 347-369.  In the Cardiac

12  Residual Functional Capacity Questionnaire ("RFC Questionnaire") completed by Dr. Wulff

13  on February 2, 2006, Dr. Wulff described Graham's diagnosis as nonsustained ventricular

14  tachycardia with a "good" prognosis. A.T. 348.  Dr. Wulff identified the following as

15  Graham's symptoms:  "chest pain, fatigue, weakness, palpitations," but did not identify

16  shortness of breath or dizziness as symptoms. A.T. 348.

17       Dr. Wulff's treatment notes mention that Graham suffered side effects from

18  medications but also indicate that she experienced improvement over time.  His April 29,

19  2005 treatment notes show that Graham complained of feeling "wiped out" by Digoxin,[6] and

20  that Graham reported she did not take it on days when she "needs to do something." A.T.

21  365.  Later, on June 30, 2005, Graham reported she had brief dizziness but felt the "meds

22  are at best." A.T. 359.  Dr. Wulff's September 30, 2005 treatment notes indicate that

23  "Lexapro helps [Graham] a lot with anxiety symptoms." A.T. 358.  On the RFC

24  Questionnaire from February 2, 2006, Dr. Wulff listed the following medications Graham

25

26  _____

27       [6] Dixogin is a cardiac glycoside used to treat heart failure and irregular heartbeat.  See
http://www.webmd.com/drugs/drug-8482-Lanoxin+Oral.aspx?drugid=8482&drugname=Lan
28  oxin+Oral (last visited Feb. 26, 2009).

United States District Court

For the Northern District of California

1   was prescribed: Ambien, Sotalol[7], Lexapro, Digoxin, and glucophage[8].  A.T. 349.  Dr. Wulff

2   described the side effects from these medications as "none."  A.T. 349.  Also on this

3   questionnaire, Dr. Wulff indicated that stress played a "significant role" in Graham's

4   symptoms, but that Graham could tolerate "moderate stress" at work, reasoning that "she

5   seems to be functioning better on current therapy."  A.T. 349.  However, Dr. Wulff also

6   stated that the frequency with which Graham's symptoms, including psychological

7   symptoms, would interfere with her attention and concentration needed for work was

8   "unknown."  A.T. 349.

9        Graham visited psychiatrist Nestor Vaschetto on January 23, 2004, whose apparent

10  progress note[9] shows a diagnosis of "adjustment disorder w/anxious mood" and "r/o [rule

11  out] mental disorder secondary to B [beta] blocker."  A.T. 224.  Per the progress note, Dr.

12  Vaschetto's plan was to continue Graham on Lexapro and Ambien and have her return on

13  an as-needed basis.  A.T. 224.  In this progress note, Graham's mental disorder is

14  described as "most probably, organically and pharmacologically induced."  A.T. 224.  Dr.

15  Vaschetto also described Graham as having fear and anxiety due to the "what if" of her ICD

16  going off unexpectedly.  A.T. 224.

17       On May 2, 2004, psychiatrist Barbara Vignola performed a consultative psychiatric

18  evaluation of Graham,[10] and diagnosed her with the following DSM-IV Axis I disorders:

19

20       [7] Sotalol is used to treat sustained ventricular tachycardia.  See
21  http://www.webmd.com/drugs/drug-8848-Sotalol+Oral.aspx?drugid=8848&drugname=Sotal
    ol+Oral (last visited Feb. 26, 2009).

22       [8] Glucophage is used to control high blood sugar in persons with type II diabetes.  See
23  http://www.webmd.com/drugs/drug-11294-Glucophage+Oral.aspx?drugid=11294&drugnam
    e=Glucophage+Oral (last visited Feb. 26, 2009).

24       [9] This progress note is unsigned, and there is nothing on the note that indicates it was
25  authored by Dr. Vaschetto.  Instead, the names of Dr. Hundal and Dr. Wulff are handwritten
    at the top.  The form does not provide the name of the doctor or any medical office.

26       [10] In her written report of this evaluation, Dr. Vignola noted that the record available for
27  her to review was limited to the progress note from Dr. Vaschetto, discussed above.  Dr.
    Vignola noted that it was unsigned and that Dr. Vaschetto "might have written this note."  A.T.
28  244.

4

United States District Court

For the Northern District of California

Depressive disorder, NOS ("not otherwise specified"); Anxiety disorder, NOS.  A.T. 244-248.  Dr. Vignola described Graham's daily activities as follows:  "The claimant is able to go shopping with her husband who helps her.  He does the driving because the claimant is fearful of driving because of her cardiac problem.  She fears passing out while driving. . . . She takes her son to school but she did not say how she gets him there."  A.T. 245.  As for Graham's mood/affect, Dr. Vignola stated the following:  "The claimant appears depressed. When I asked about this, the claimant stated that she does not want to believe that she could be depressed. . . . She appears anxious and tearful during the interview.  Her affect is congruent with her mood of anxiety.  She appears to be clinically depressed."  A.T. 246.

Dr. Vignola's opinion was that Graham had "a treatable psychiatric condition" which "could improve somewhat within 12 months."  A.T. 247.  However, Dr. Vignola further stated that "due to the severity of [Graham's] medical problems, for which she has some concern, the likelihood of recovery is guarded."  A.T. 247.  Dr. Vignola's functional assessment of Graham was the following:  "I do not feel that this claimant would be able to perform simple and repetitive tasks or otherwise work because she has severe anxiety and this anxiety causes her to not concentrate well.  Anxiety could exacerbate her medical condition and cause serious cardiac complications, including death."  A.T. 248.  A Disability Determination Services ("DDS") physician also completed a Residual Functional Capacity Assessment of Graham's mental impairments on May 25, 2004, which indicates that Graham is "markedly limited" only in her "ability to carry out detailed instructions."  A.T. 249-252.

Graham also sought medical treatment from other physicians for a variety of ailments, but none of the other treatment was for mental health problems.

## STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act ("the Act") provides for the payment of disability insurance benefits to people who have contributed to the Social Security system and who suffer from a physical or mental disability.  See 42 U.S.C. § 423(a)(1).  To evaluate whether a claimant

United States District Court

For the Northern District of California

is disabled within the meaning of the Act, the ALJ is required to use a five-step analysis. 20 C.F.R. § 404.1520. The ALJ may terminate the analysis at any stage where a decision can be made that a claimant is or is not disabled. See Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At step one, the ALJ determines whether the claimant is engaged in any "substantial gainful activity," which would automatically preclude the claimant from receiving disability benefits. See 20 C.F.R. § 404.1520(a)(4)(i). If not, at the second step, the ALJ must consider whether the claimant suffers from a severe medically determinable physical or mental impairment which "significantly limits [the claimant's] physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). At the third step, the ALJ compares the claimant's impairment to a listing of impairments in the regulations. If the claimant's impairment or combination of impairments meets or equals the severity of any medical condition contained in the listing, the claimant is presumed disabled and is awarded benefits. See 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant's condition does not meet or equal a listing, the ALJ must proceed to the fourth step to consider whether the claimant has sufficient "residual functional capacity" ("RFC") to perform her past work despite the limitations caused by the impairment. See 20 C.F.R. § 404.1520(a)(iv). If the claimant cannot perform her past work, the Commissioner must show, at step five, that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's "residual functional capacity, age, education, and past work experience." See 20 C.F.R. § 404.1520(a)(4)(v).

Overall, in steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in the claimant's previous occupation. Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995). If the analysis proceeds to step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other work. Id.

6

**ALJ's FINDINGS**

In this case, the ALJ determined that Graham was not disabled at step five of the evaluation.  A.T. 20.

At step one, the ALJ concluded that Graham had not engaged in any substantial gainful activity since May 8, 2003.  A.T. 16.  At step two, the ALJ found that Graham suffered from the following severe impairments: "supraventricular[11] and non-sustained ventricular tachycardia; diabetes mellitus, controlled on oral medication, without evidence of secondary problems or complications; and an anxiety disorder and a depressive order, mild, controlled on prescribed medication."  A.T. 18.

Also at step two, the ALJ considered the possible side effects of Graham's medications, comparing Graham's testimony at the initial hearing with that of the medical expert ("ME"), Dr. Bello, as well as notes from Graham's treating physician, Dr. Wulff.  A.T. 18.  The ME, Dr. Bello, testified that he could not conclude whether Graham's claimed side effects were caused by her medications, and he also could not state which medications would cause the side effects of which Graham complained.  A.T. 18.  Dr. Wulff, Graham's treating physician, however, described Graham's medication side effects as "none" on his RFC Questionnaire.  A.T. 18.  The ALJ also considered evidence provided in Dr. Wulff's treatment notes but found there was "not much" evidence that Graham complained of side effects when she saw Dr. Wulff.  A.T. 18.  Based on the ME testimony and the preponderance of the evidence, the ALJ found the record insufficient to support a finding of significant side effects from medication at step two of the analysis.  A.T. 18.

At step three, the ALJ concluded that Graham's combined impairments did not meet or equal any Listed impairment under Appendix 1, Subpart P, Regulations No. 4.  A.T. 19.  This finding was based primarily on the opinion of the ME.  A.T. 19.  Specifically, the ME testified that Graham's conditions were controlled by her ICD device and medications.  A.T.

---

[11] "Supraventricular tachycardia" is defined as "rapid heart rate due to a pacemaker anywhere above the ventricular level, i.e., sinus node, atrium, atrioventricular junction." Stedman's Medical Dictionary 1931 (28th ed. 2006).

United States District Court
For the Northern District of California

19.  The ALJ cited evidence supporting the ME's opinion, including Graham's testimony that her ICD had not "fired" since April 2003 and the fact that she only once visited a psychiatrist, Dr. Vaschetto, for her anxiety, which seemed to be controlled by medication. A.T. 19.  Moving to the functional criteria under Listings 12.04 and 12.06, the ALJ found "a 'mild' restriction of activities of daily living, 'mild' difficulties in maintaining social functioning, and 'mild-to-moderate' difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation."  A.T. 19.

Proceeding to step four, the ALJ determined that Graham retained the following residual functional capacity (RFC):

> From an exertional standpoint, she is limited to "sedentary" work activities, as defined at 20 CFR 404.1567(a) (see also SSR 96-8p), i.e., she can lift/carry up to 10 pounds occasionally and less than 10 pounds frequently, stand/walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday, and sit (with normal breaks) for about 6 hours in an 8-hour workday.  She cannot perform any climbing (even stairs), crawling, or balancing.  She can use the non-dominant left upper extremity for only occasional above-shoulder reaching.  She must avoid concentrated exposure to heat extremes, high humidity, cigarette smoke, solvents/cleaners, fumes, odors, gases, and chemicals.  She can have only occasional required interaction with the public and co-workers.  She is limited to the performance of 1-2-3 step jobs.  She has the ability to sustain average pace during a workday, but not more than average pace.  There are no other non-exertional limitations (20 CFR 404.1545).

A.T. 19.

In this RFC assessment, the ALJ relied primarily on the RFC assessment provided by Graham's treating physician, Dr. Wulff, as well as the testimony and opinion of the ME, Dr. Bello.  A.T. 19.  The ALJ explicitly rejected the opinion of Dr. Vignola, a consultative examining (CE) psychiatrist, who opined that Graham could not perform "simple and repetitive tasks" due to her anxiety and inability to concentrate.  A.T. 19.  To support his rejection of Dr. Vignola's opinion, the ALJ stated that "Dr. Vignola saw the claimant only once, and his [sic] opinion is inconsistent with the claimant's admitted activities as expressed to the CE, and with the nearly complete lack of mental health treatment."[12]  A.T. 19.

---

[12] The ALJ did not, however, discuss the opinions of the DDS psychiatrists.

United States District Court

For the Northern District of California

1    With regard to Graham's credibility, the ALJ found Graham "generally credible" but

2    concluded that "the medical evidence simply does not support the level [of worry and

3    stress] allegedly experienced by this claimant."  A.T. 20.

4    At step four, the ALJ found that Graham had met her burden of showing that she

5    could not perform her past relevant work because of her medical impairments.  A.T. 20.

6    The ALJ based this determination on the opinion of the VE, Ms. Rynd, who testified that a

7    similar person would not be able to perform Graham's previous work as a receptionist.  A.T.

8    20.

9    At the fifth step, the ALJ determined that the Commissioner had met the burden of

10   showing that Graham could perform other work.  A.T. 20.  This finding was based on the

11   testimony of the VE, Ms. Rynd, that a hypothetical person with Graham's RFC and

12   vocational profile could perform a range of unskilled, entry-level sedentary jobs, including

13   the following: Compact Assembler, Final Assembler, Stuffer, Document Preparer, and

14   Cutter/Paster.  A.T. 20.  The VE testified as to the number of such jobs in the local and

15   national economies and the percentage erosion of jobs that would result from Graham's

16   non-exertional limitations and pace limitation.[13]  A.T. 20.  Based on the VE testimony, the

17   ALJ found that the number of remaining jobs was significant even after accounting for all

18   erosion.  A.T. 20.  Accordingly, the ALJ concluded that Graham must be found "not

19   disabled" at step five, based on Medical-Vocational Rules 201.28/201.21 of Appendix 2,

20   Subpart P, Regulations No. 4 in conjunction with the VE's testimony.  A.T. 20.

21                              **STANDARD OF REVIEW**

22   This court has jurisdiction to review final decisions of the Commissioner pursuant to

23   42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the ALJ's findings are

24   "supported by substantial evidence and if the [ALJ] applied the correct legal standards."

25

26       [13] Social Security Ruling 96-9p (1996) explains, "When there is a reduction in an
     individual's exertional or nonexertional capacity so that he or she is unable to perform
27   substantially all of the occupations administratively noticed in Table No. 1, the individual will
     be unable to perform the full range of sedentary work: the occupational base will be 'eroded'
28   by the additional limitations or restrictions."

**United States District Court**
For the Northern District of California

Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001).  "Substantial evidence" means more than a scintilla, but less than a preponderance, or evidence which a reasonable person might accept as adequate to support a conclusion.  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). The court is required to review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision.  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991) (citing Booz v. Sec'y of Health and Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984)).

When the Appeals Council denies review after evaluating the entire record, including newly submitted evidence, that new evidence becomes a part of the administrative record to be reviewed by this court on appeal.  See Ramirez v. Shalala,     8 F.3d 1449, 1452 (9th Cir. 1993).  Thus, this court must consider the evidence before both the ALJ and the Appeals Council in reviewing the ALJ's decision.[14]  Id.

## ISSUES

Graham seeks reversal of the Commissioner's denial of Social Security disability benefits, arguing that

(1)    the ALJ erred in determining her RFC;

(2)    the ALJ erred by posing a hypothetical question to a vocational expert without including all of her limitations; and

(3)    the ALJ erred in rejecting her subjective complaints based on his perception of her activities of daily living and how they related to her ability to work.

---

[14] New evidence received by the Appeals Council consisted of the following: Exhibit AC-1, Representative's argument dated Nov. 17, 2006, in support of the request for review; and Exhibit AC-2, Claimant's statement, undated.

**United States District Court**
For the Northern District of California

1    Although the ALJ made his decision at step five of the analysis, Graham erroneously

2    argues that the ALJ's determination at step *four* was incorrect.  (Pl.'s Br. 1).  However, the

3    ALJ's finding at step four, that Graham had carried her burden to show she could not

4    perform her previous work, was actually *favorable* to her.  Accordingly, the court presumes

5    that Graham intended to argue that the ALJ's determination at step *five* was in error.

6                                            **DISCUSSION**

7    **1.       The ALJ did not err in determining Graham's RFC**

8            Graham argues that the ALJ erred in determining her RFC.  Specifically, she argues

9    that:  1) the ALJ erred in disregarding the opinion of the one-time consultative examining

10   psychiatrist who opined that she could not work due to severe anxiety and loss of

11   concentration; 2) the ALJ's assessment of her anxiety disorder is inconsistent with the

12   findings of the DDS reviewing psychiatrists; and 3) evidence from treating physician Dr.

13   Wulff supports a finding that her mental impairment is significantly limiting.

14           As noted, the ALJ relied on the opinions of Graham's treating physician, Dr. Wulff,

15   and the medical expert (ME), Dr. Bello, in determining her RFC.

16           In weighing the opinions of physicians, the Ninth Circuit distinguishes between three

17   categories of physicians: 1) those who treat the claimant (treating physicians); 2) those who

18   examine but do not treat the claimant (examining physicians); and 3) those who neither

19   examine nor treat the claimant (non-examining physicians).  Lester v. Chater,     81 F.3d

20   821, 830 (9th Cir. 1995).  Generally, controlling weight is given to a treating physician's

21   opinion regarding a claimant's medical disability.  Id.  If a discrepancy exists between the

22   opinions of different physicians, the ALJ may discount a treating physician's opinion by

23   setting forth "specific and legitimate reasons" based upon substantial evidence.  Id. at 830-

24   31.  The ALJ can meet this burden by "setting out a detailed and thorough summary of the

25   facts and conflicting clinical evidence, stating his interpretation thereof, and making

26   findings."  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600-01 (9th Cir. 1999)

27   (quoting Magallanes, 881 F.2d at 750).

28

                                                  11

**United States District Court**
For the Northern District of California

1    In his decision, the ALJ explained that in making a determination regarding

2    Graham's RFC, he relied on the opinion of Dr. Wulff, Graham's treating physician, and the

3    opinion and testimony of the ME.  A.T. 19.  Specifically, he relied on the RFC assessment

4    provided by Dr. Wulff.  At the hearing, the ME testified that he agreed with Dr. Wulff's

5    assessment.  A.T. 401.  As a treating physician, Dr. Wulff's opinion was entitled to the most

6    weight.

7        **A.    Opinion of Consultative Examining Psychiatrist**

8    Graham contends that the ALJ erred in disregarding the opinion of Dr. Vignola, a

9    consultative examining psychiatrist.  Dr. Vignola opined that Graham could not "perform

10   simple and repetitive tasks or otherwise work" due to her anxiety and inability to

11   concentrate.  A.T. 248.  Dr. Vignola also stated, however, that Graham had "a treatable

12   psychiatric condition" that "could improve somewhat within twelve months."  A.T. 247.

13   In determining Graham's RFC, it was proper for the ALJ to afford the greatest weight

14   to the opinion of Graham's treating physician and to disregard the inconsistent opinion of

15   the consultative examining physician, Dr. Vignola.  Furthermore, the ALJ provided specific

16   and legitimate reasons for rejecting Dr. Vignola's opinion.

17   The opinion of an examining doctor can only be rejected for specific and legitimate

18   reasons that are supported by substantial evidence in the record.  Lester, 81 F.3d at

19   830-31.  Here, the ALJ provided two specific and legitimate reasons for rejecting Dr.

20   Vignola's findings at this stage of the analysis.  First, he stated that Dr. Vignola saw

21   Graham only one time.  A.T. 19.  Second, the ALJ stated that Dr. Vignola's opinion was

22   inconsistent with Graham's "admitted activities as expressed to [Dr. Vignola], and with the

23   nearly complete lack of mental health treatment."  A.T. 19.

24   In weighing medical source opinions, the ALJ may consider the frequency of

25   examinations, the length of the treatment relationship, and the nature and extent of

26

27

28

treatment.[15]  20 C.F.R. 404.1527(d)(2).  Although Dr. Vignola is classified as an examining physician, she did not have a treatment relationship with Graham.  She examined Graham one time for the purpose of conducting a psychiatric evaluation, and was required to reach a decision based on a single interview with Graham.[16]  In addition, Dr. Vignola indicated that Graham's condition could improve.  A.T. 247.

The ALJ noted that Dr. Vignola's opinion regarding Graham's inability to work was the only such opinion in the record.  A.T. 19.  The ALJ may reject an opinion that is not supported by the record.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)).  Generally, an opinion that is consistent with the record as a whole is entitled to more weight. 20 C.F.R. § 404.1527(d)(4).  The ALJ described Dr. Vignola's opinion that Graham could not work at all as an "exception" because he found no other opinions in the record of either treating or examining physicians suggesting that was the case.  A.T. 19.  Since Dr. Vignola's opinion was not consistent with the record, the ALJ was entitled to reject this opinion that Graham was incapable of performing any work.

In addition to being inconsistent with the record as a whole, the ALJ also found that Dr. Vignola's opinion was internally inconsistent because of the daily activities Graham described to Dr. Vignola.  An ALJ may consider the daily activities of a claimant in deciding the claimant is not disabled.  See Morgan, 169 F.3d at 600; Curry, 925 F.2d at 1130. During Dr. Vignola's examination, Graham described her daily activities, including going shopping with her husband and taking her son to school.  A.T. 245.

The ALJ also found Dr. Vignola's opinion inconsistent with Graham's "nearly

---

[15] The opinion of a consultative examining physician specifically has been held to be entitled to "limited weight."  See Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990).

[16] Further, as noted, it appears that Dr. Vignola had only one piece of paper to review from Graham's medical history.  That was the "progress note" from Dr. Vaschetto, which Dr. Vignola noted was unsigned.  While Dr. Vignola opined that Graham's anxiety could exacerbate her heart condition and even cause death, it does not appear that she relied on any medical records about Graham's heart condition in order to make this determination.

13

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1　complete lack of mental health treatment." A.T. 19. An ALJ may reject allegations of

2　disability where treatment is conservative. See Rollins v. Massanari, 261 F.3d 853, 856

3　(9th Cir. 2001); Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007); Johnson v. Shalala,

4　60 F.3d 1428, 1434 (9th Cir. 1995). Graham only saw Dr. Vaschetto once, whose

5　treatment note Dr. Vignola relied on, and she had one consultative examination with Dr.

6　Vignola. Besides taking Lexapro, which was overseen by her treating physician Dr. Wulff,

7　Graham sought out no other treatment for her anxiety. Dr. Wulff was aware of Graham's

8　anxiety and related treatment, but was not of the opinion that Graham could not work at all.

9　　　　As explained above, the ALJ set forth specific, legitimate reasons for disregarding

10　Dr. Vignola's opinion regarding Graham's ability to work. Because Dr. Vignola is a

11　consultative examining physician, the ALJ was entitled to reject her opinion and afford

12　controlling weight to the opinion of Graham's treating physician, Dr. Wulff. Therefore, the

13　ALJ did not err in disregarding Dr. Vignola's opinion.

14　　**B.　　Findings of DDS Psychiatrists / State Agency Reviewing Physicians**

15　　　　Graham also argues that the ALJ erred in disregarding the opinions of the DDS

16　reviewing physicians.[17] Specifically, she contends that the ALJ erred in characterizing her

17　anxiety and depression as "mild" and controlled by medications when two DDS physicians

18　described her mental impairment as "severe." Graham asserts that the ALJ must consider

19　the opinions of state agency consultants, citing 20 C.F.R. § 404.1527(f)(2)(i)(2008) and

20　Social Security Ruling 96-6p (1996).[18] Graham further contends that the ALJ's disregard of

21

22　　　　[17] Graham's brief erroneously describes the DDS physicians as "examining physicians." (Pl.'s Br. 16). The Commissioner's opposition brief correctly refers to these physicians as state agency reviewing physicians. (Opp'n Br. 6). Although neither party explained the role of DDS physicians, the court notes that "DDS" presumably refers to the Disability Determination Service Division of the California Department of Social Services, which instructs applicants for Social Security Disability Insurance that it "will obtain your medical and other records to assess the severity of your impairments and the impact of them on your ability to engage in substantial gainful work activity." California Department of Social Services website, http://www.dss.cahwnet.gov/cdssweb/PG118.htm (last visited March 2, 2009).

27　　　　[18] Social Security Rulings reflect the Commissioner's official interpretation of the Social Security Administration's regulations and, although they do not have the force of law, they are entitled to some deference if they are congruent with the Social Security Act and regulations.

United States District Court

For the Northern District of California

1    their opinions violates agency policy.

2         Graham does not provide any support to show that the ALJ's failure to explicitly

3    discuss state agency reviewing physician findings in his decision "violates Agency policy" or

4    that such omission would constitute legal error.  To the contrary, a closer reading of the

5    regulations demonstrates that the ALJ was not required to explain the weight given to these

6    opinions.

7         Graham's reading of the regulations is selective.  The pertinent regulation, 20 C.F.R.

8    § 404.1527(f)(2)(i), states, "Administrative law judges are not bound by any findings made

9    by State agency medical or psychological consultants, or other program physicians or

10   psychologists."  Section 404.1527(f)(2)(ii) then explains that the weight given to DDS

11   physician findings, which are considered as opinion evidence under subparagraph (i),

12   follows the factors set forth in 20 C.F.R. § 404.1527(a)-(e).  This subpart further explains

13   that "*Unless the treating source's opinion is given controlling weight*, the administrative law

14   judge must explain in the decision the weight given to the opinions of a State agency

15   medical or psychological consultant or other program physician or psychologist . . . ."      20

16   C.F.R. § 404.1527(f)(2)(ii).

17        The ALJ's failure to explicitly discuss the state agency reviewing physicians' findings

18   in his decision does not constitute legal error.  The ALJ *did* give controlling weight to the

19   opinion of Graham's treating physician, Dr. Wulff.  Therefore, the ALJ was not required to

20   discuss the findings of the state agency reviewing physicians in his decision.  See

21   20 C.F.R. § 404.1527(f)(2)(ii).  Furthermore, had the ALJ's omission constituted error, the

22   error would have been harmless.

23        On the Mental RFC Assessment, the state agency reviewing physicians found

24   Graham was moderately limited in several areas.  A.T. 249-50.  Graham argues that the

25   ALJ was required by the regulations to mention these findings.  (Pl.'s Br. 17).  Graham

26   improperly characterizes the role of the state agency reviewing physicians and asserts that

27   _____

28   Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

United States District Court

For the Northern District of California

1    the ALJ must discuss these findings in his written decision.  However, although the ruling

2    cited by Graham, SSR 96-6p (1996), discusses the role of the state agency physicians, it

3    also explains that the RFC determination is left to the Commissioner.  See also 20 C.F.R.

4    § 404.1527(e)(2) ("Although we consider opinions from medical sources on issues such

5    as . . . your residual functional capacity (citations omitted), or the application of vocational

6    factors, the final responsibility for deciding these issues is reserved to the Commissioner.").

7        On the Psychiatric Review Technique form, state agency reviewing physician Robert

8    E. Lee, M.D., indicated the following category as Graham's medical disposition:

9    "Impairment(s) Severe But Not Expected to Last 12 Months."  A.T. 253.  The findings on

10   this review form were affirmed by another DDS physician, Dr. Danilo Lucila.  A.T. 253.

11   However, contrary to Graham's suggestion, the Psychiatric Review Technique form is *not*

12   an RFC assessment form.  Rather than providing an assessment for the ALJ's

13   determination of a claimant's RFC at step four, this form simply identifies limitations for

14   steps two and three of the analysis.  See Social Security Ruling 96-8p (1996).

15       As noted, at step two, the ALJ found that Graham suffered from severe medically

16   determinable mental impairments in addition to physical impairments.  A.T. 18.  The ALJ

17   found that these mental impairments included "an anxiety disorder and a depressive

18   disorder, mild, controlled on prescribed medication."  A.T. 18.  Although the ALJ described

19   these conditions as mild and controlled on medication, he did not ignore the indication on

20   the Psychiatric Review Technique form that Graham suffered from severe mental

21   impairments, including anxiety.  The ALJ's inclusion of Graham's anxiety among her severe

22   medically determinable impairments at step two was consistent with a finding by a state

23   agency reviewing physician that her mental impairment was severe.

24       As mentioned previously, the state agency physicians did not expect Graham's

25   mental impairments to last twelve months.  A.T. 253.  The ALJ explained that he is required

26   to consider medically determinable impairments that meet the twelve-month requirement in

27   the remaining steps of his analysis.  A.T. 17 (citing 20 C.F.R. §§ 404.1509, 404.1523).  In

28

United States District Court

For the Northern District of California

1  his decision, the ALJ cited Dr. Vignola's report as evidence of these impairments.  A.T. 18.

2  In citing Dr. Vignola's report, the ALJ was using evidence that was in fact more favorable to

3  Graham than the findings of state agency physicians located on the Psychiatric Review

4  Technique form.  Therefore, there was no need for the ALJ to discuss the findings of state

5  agency physicians at this step of the analysis, nor would such a discussion have resulted in

6  a decision more favorable to her.

7        Graham's referral to the state agency reviewing physicians as "examining"

8  physicians incorrectly suggests that greater weight should have been given to their findings

9  and that the ALJ would have been required to discuss them in his decision.  Graham's

10  selective reading of the Social Security guidelines regarding the "findings of state agency

11  medical and psychological consultants as opinion evidence" is also misleading.  See SSR

12  96-6p (1996).  Based on this court's research and review of the record, it appears that the

13  role of the state agency reviewing physicians was simply to complete the Mental Residual

14  Functional Capacity Assessment form and the Psychiatric Review Technique form.  A.T.

15  249-66.  The government fails to explain the role of the state agency physicians, arguing

16  instead that the mental impairments found by these physicians were not expected to last

17  twelve months and were therefore not disabling.[19]

18        Nevertheless, as explained above, the ALJ was not required to discuss these

19  findings in his decision because he gave controlling weight to the opinion of Graham's

20  treating physician, Dr. Wulff.  Furthermore, the final RFC determination is reserved to the

21  Commissioner.  Therefore, even if the ALJ was required to discuss the DDS physicians'

22  findings, any such omission constitutes harmless error.  That is because even considering

23  all of Graham's limitations noted on the forms completed by state agency reviewing

24  physicians, the ALJ would still have arrived at the same determination regarding Graham's

25

26        [19] This argument is incomprehensible since the ALJ already decided at step two that
27  Graham suffered from anxiety.  The issue here is whether the ALJ was bound by the findings
   of the state agency reviewing physicians or even required to discuss their findings in his
28  decision.

17

United States District Court

For the Northern District of California

1  disability.  The ALJ decided Graham's case at step five, based on VE testimony regarding

2  unskilled, sedentary work, which does not require an individual to possess the mental ability

3  to perform the complete range of jobs within that category.  See SSR 96-9p (1996).

4        **C.**      **Treating Physician Dr. Wulff's Opinion**

5        Finally, Graham argues that the evidence in medical records provided by Dr. Wulff

6  supports a finding that her mental impairment is significantly limiting.  Graham relies on one

7  answer provided by Dr. Wulff on the RFC Questionnaire regarding whether her physical

8  symptoms were the cause of her emotional problems, in which he stated, "I'm concerned

9  that her symptoms and diagnosis play a role but I'm not a therapist." A.T. 349.  She

10  argues that this answer indicates that Dr. Wulff's assessment of her mental impairments

11  was the same as that of Dr. Vignola and the DDS reviewing physicians.  However, Dr.

12  Wulff's opinion that Graham could tolerate "moderate stress" at work, which was indicated

13  on the same form, does not support Graham's argument.  A.T. 349.  As noted by the ALJ,

14  the only opinion in the record that Graham could not work came from Dr. Vignola, whose

15  opinion has already been discussed above, and for which the ALJ provided specific and

16  legitimate reasons for rejecting.

17  **2.**      **The ALJ's hypothetical included all of Graham's limitations that were**

18          **supported by substantial evidence**

19        Graham further argues that the ALJ erred by posing a hypothetical to the vocational

20  expert (VE) that excluded limitations noted by Dr. Vignola regarding her ability to perform

21  simple repetitive work and her limited ability to concentrate.

22        When the ALJ poses a hypothetical question to a vocational expert, the question

23  "must set out all the limitations and restrictions of the particular claimant" that are supported

24  by substantial evidence.  Magallanes, 881 F.2d at 756.  "The testimony of a vocational

25  expert is valuable only to the extent that it is supported by medical evidence. . . . The

26  vocational expert's opinion about a claimant's residual functional capacity has no

27  evidentiary value if the assumptions in the hypothetical are not supported by the record."

28

United States District Court

For the Northern District of California

1  Id.

2      In this case, the VE testified over the course of two hearings.  At the first hearing, the

3  ALJ posed a hypothetical to the VE which included the limitations below for someone of

4  Graham's age, education and work experience:

> The capacity to stand and walk for up to four hours out of an eight-hour day,
> sit for six hours at least out of an eight-hour day.  Lift and carry 10 pounds
> frequently, 20 pounds occasionally.  Frequently twist and stoop, occasionally
> crouch but no climbing or balancing, not even stairs in the work place, and I'll
> add no crawl as well to that.  With the left non-dominant upper extremity over
> the shoulder or above shoulder reaching is limited to occasional.
> Environmental limitations as follows, avoid concentrated exposure to extreme
> heat, high humidity, cigarette smoke, solvents and cleaners, fumes, odors
> and gases, . . . chemicals . . . With those restrictions, or limitations, could the
> job of receptionist be performed?

11  A.T. 408.  The ALJ then addressed Graham's limited ability to handle stress, noting that

12  Graham could tolerate "moderate stress."  A.T. 409.  At this point in the hearing, the ALJ

13  allowed Harvey Sackett, Graham's attorney, to suggest a definition for this added limitation

14  which Sackett described as "emotional limitations."  A.T. 410.  Sackett described the

15  limitation to the VE as follows: "That the individual can actually perform the underlying task,

16  however, at some point during the course of the workday and/or work week from anywhere

17  to 11 to 20 percent of the time the person's either going to go off task completely or not

18  perform the task commensurate with the employer's expectations."  A.T. 410.

19      At the second hearing, the ALJ elicited additional VE testimony pertaining to step

20  five, and specifically with respect to unskilled work.  The ALJ posed the following limitations

21  to the VE (who was the same VE that testified at the first hearing):

> Capacity for sedentary work, no climbing, including stairs, no crawling or
> balancing.  With the left, non-dominant upper extremity only occasional above
> shoulder reaching.  No concentrated exposure to extremes of heat, high
> humidity, cigarette smoke, solvents, cleaners or chemical fumes, odors,
> gases or chemicals. . . .  Required interaction with the public is limited to
> occasional and the ability to perform simple, one to two, three-step jobs.

26   A.T. 419.  During the second hearing, the ALJ also included Sackett's proffered definition

27  of a "moderate" limitation to incorporate Graham's limited ability to maintain attention and

28

19

United States District Court

For the Northern District of California

1    concentration for extended periods of time, explaining that Graham's counsel had posed

2    the limitation in that way.  A.T. 430.

3        Graham now argues that the limitations supplied by the ALJ in his hypothetical to the

4    VE were incomplete.  However, significantly, Graham's own attorney was allowed to pose

5    "emotional limitations" to the VE and quantify these limitations in exact percentages.

6    Therefore, Graham's argument is not persuasive given that her attorney was able to

7    provide his own suggested percentage limitation.  In addition, as noted by the ALJ in his

8    decision, the VE testified about the percentage erosion that would be caused by Graham's

9    non-exertional limitations and pace limitation.  A.T. 20.

10       Moreover, the ALJ included additional mental functioning restrictions at the second

11   hearing.  Thus, even if the ALJ's hypothetical at the first hearing was incomplete, it did not

12   impact Graham because the ALJ ultimately decided step four in her favor.  The ALJ's step

13   five determination was made based on VE testimony at the *second* hearing, at which his

14   hypothetical actually included even more restrictions and limitations than those included in

15   the hypothetical at the initial hearing.

16   **3.    The ALJ did not err in rejecting Graham's subjective complaints based on her**

17   **daily activities**

18       Finally, Graham argues that the ALJ erred in rejecting her subjective complaints.

19   Specifically, she argues that:  1) the ALJ ignored the side effects caused by her

20   medications; 2) the ALJ erred in rejecting her subjective complaints based on her daily

21   activities; and 3) the ALJ erred in his analysis of her credibility.

22       **A.    Medication Side Effects**

23       Graham argues that the ALJ ignored the side effects caused by her medications,

24   stating that, "[d]espite [her] testimony and several references in the record to side-effects of

25   medication, the ALJ's hearing decision is devoid of any analysis related to these

26   complaints."  (Pl.'s Br. 21).  This seems to be an oversight on Graham's part.

27       In his decision, the ALJ considered the testimony of the ME and the notes from

28

United States District Court

For the Northern District of California

1  Graham's treating physician, Dr. Wulff, regarding medication side effects.  A.T. 18.  The

2  ALJ mentioned the ME's testimony that Graham's claimed side effects "may or may not be

3  related to [her] medications."  A.T. 18.  Furthermore, the ME could not state specifically

4  which medications would cause the side effects of which Graham complained.  A.T. 18.

5  The ALJ also considered the opinion of Dr. Wulff, Graham's treating physician, who

6  described Graham's side effects as "none" on his RFC questionnaire.  A.T. 18.  In addition,

7  the ALJ referred to Dr. Wulff's treatment notes and concluded there was "not much"

8  evidence that Graham complained of side effects from her medications.  A.T. 18.  The ALJ

9  noted specifically Graham's comment to Dr. Wulff at her June 30, 2005, visit that the

10  medications were at their "best."  A.T. 18.  Based on the above evidence, the ALJ

11  concluded that the side effects of Graham's medications were not significant.  A.T. 18.

12      Since the ALJ properly included a finding regarding the significance of side effects

13  from Graham's medications, her argument on this issue is without merit.

14      **B.   Subjective complaints**

15      Graham also argues that the ALJ erred in rejecting her subjective complaints.

16  Specifically, she asserts that the ALJ "assumed the role of psychiatrist" rather than

17  addressing the appropriate issues to determine her credibility.  (Pl.'s Br. 21).

18      The ALJ must give careful consideration to any evidence of symptoms because

19  subjective descriptions may better indicate severe limitations or restrictions than medical

20  evidence alone.  Robbins v. Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (citing

21  SSR 96-8p (1996)) (internal quotations omitted).  "When giving such consideration, if the

22  record establishes the existence of a medically determinable impairment that could

23  reasonably give rise to the reported symptoms, an ALJ must make a finding as to the

24  credibility of the claimant's statements about the symptoms and their functional effect."  Id.

25  at 883 (citing Social Security Ruling 96-7p (1996)).

26      The issue of whether the ALJ erred in rejecting Graham's subjective complaints

27  depends on whether the ALJ erred in his analysis of Graham's credibility, as discussed

28

21

below.

### C.     Credibility Analysis

Graham argues that the ALJ erred in his analysis of her credibility, citing SSR 96-7p (1996), and the answers she provided on her Daily Activities Questionnaire dated March 26, 2004.  (Pl.'s Br. 22); A.T. 113-118.  On this questionnaire, Graham described her daily activities, including cooking, shopping, household chores, talking on the phone, reading, and taking care of her son.  A.T. 113-118.  Regarding the difficulties she encountered caring for her personal needs, Graham stated that, "I do things at my own pace.  I can do all these things but I do them slow and take my time.  Rest in between.  Don't do everything at once."  A.T. 113.  On this same questionnaire, Graham indicated that she could drive a car when going out of the house.  A.T. 115.  In her Disability Report - Appeal, dated November 29, 2004, she stated the following changes to her daily activities: "I am more lethargic now than ever.  The increased number of medication [sic] almost make it impossible to function on a daily basis.  I sleep most of the day.  No energy.  No drive.  It would be impossible for me to work."  A.T. 132.

In his decision, the ALJ stated that he found Graham generally credible, but he concluded that the level of worry or stress she alleged was not supported by the medical evidence.  A.T. 20.

The ALJ made the following finding regarding Graham's credibility:  "Although generally credible, she clearly can work in settings with less stress than her past work; the record in its entirety is not consistent with a preclusion from all work."  A.T. 21 (citing 20 CFR § 404.1520, SSR 96-7p).  He stated:

> While I find the claimant generally credible, particularly with regard to her actual impairments, she clearly can work in settings with less stress than her past work, and she likely would benefit from gainful employment.  It appears from this record, including the ME testimony, that claimant is pre-occupied with her medical condition, thereby imposing unnecessary worry and stress upon herself.  While some degree of worry certainly is reasonable and understandable, the medical evidence simply does not support the level allegedly experienced by this claimant.

A.T. 20.

22

**United States District Court**
For the Northern District of California

1    The ALJ is responsible for determining the credibility of witnesses, including the

2  claimant, that testify before him or her.  Magallanes, 881 F.2d at 750.  Unless there is

3  affirmative evidence of malingering, the ALJ's reasons for rejecting the claimant's symptom

4  testimony must be clear and convincing.  See Burch v. Barnhart, 400 F.3d 676, 680 (9th

5  Cir. 2005) (citing Lester, 81 F.3d at 834).  While the ALJ is responsible for determining

6  credibility, the ALJ's findings "must be supported by specific, cogent reasons."  Reddick v.

7  Chater, 157 F.3d 715, 722 (9th Cir. 1998).  The ALJ must articulate what testimony he finds

8  not credible and cite the evidence that undermines the complaints made by the claimant.

9  Id. (quoting Lester, 81 F.3d at 834).

10   The ALJ may engage in ordinary techniques of credibility evaluation, such as

11  considering the claimant's reputation for truthfulness and inconsistencies in the claimant's

12  testimony.  See Burch, 400 F.3d at 680 (citing Tonapetyan v. Halter, 242 F.3d 1144, 1148

13  (9th Cir. 2001)).  Additionally, the ALJ must consider the following factors when assessing

14  the claimant's credibility: 1) the claimant's daily activities; 2) the location, duration,

15  frequency and intensity of the claimant's pain or other symptoms; 3) factors that precipitate

16  and aggravate the symptoms; 4) the effects of medication; 5) treatment other than

17  medication; 6) any measures the claimant has taken other than treatment; and 7) any other

18  factors concerning the claimant's functional limitations and restrictions.  SSR 96-7p (1996);

19  Also see Burch, 400 F.3d at 680 (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir.

20  1991)).

21   Evidence that can be considered in evaluating a claimant's credibility includes

22  inconsistencies in the claimant's testimony, the extent of the claimant's daily activities,

23  observations of physicians, or any unexplained failure to follow a course of prescribed

24  treatment.  Bunnell, 947 F.2d at 346.  Additionally, notwithstanding the Bunnell standard, a

25  lack of objective medical evidence may be a relevant consideration when coupled with the

26  above factors in determining the severity of the claimant's pain.  See Rollins, 261 F.3d at

27  857.

28

United States District Court

For the Northern District of California

1    In his analysis of Graham's credibility, the ALJ found that Graham's descriptions of

2   her limitations were not supported by the medical evidence.  A.T. 20.  In the discussion of

3   her credibility, the ALJ referred to the "medical evidence" as well as "this record, including

4   the ME testimony."  A.T. 20.  Besides referring to the ME testimony, the ALJ did not clearly

5   state what medical evidence undermined Graham's testimony.  Elsewhere in his decision,

6   the ALJ discussed Graham's alleged side effects from medications, then cited evidence

7   from her treating physician that she was not suffering from side effects.  A.T. 18.  The ALJ

8   noted that Graham disagreed with her treating physician.  A.T. 18.  The ALJ also discussed

9   the portion of Graham's testimony where the ME questioned her about her ICD device,

10  noting her statement that the device last "fired" in April 2003, "*prior to the claimed disability*

11  *onset.*"  A.T. 18 (emphasis in original).

12   Graham fails to show how the ALJ's rejection of her subjective complaints was

13  "based on his perception of her activities of daily living, and how they relate to an ability to

14  work."  (Pl.'s Br. 20).  The ALJ referred only to medical evidence in the record and

15  testimony at Graham's hearing in his decision that Graham was not fully credible.  A.T. 20.

16  It appears that Graham disagrees with the ALJ's decision simply because her conclusion

17  regarding her ability to work as evidenced by her daily activities is different from his.

18   Although the ALJ was not specific in his references to the evidence undermining

19  Graham's credibility, the ALJ discussed various factors in his decision that would support

20  such a credibility finding.  In Orteza v. Shalala, 50 F.3d 748, 749 (9th Cir. 1995), cited by

21  Graham, the claimant argued that the ALJ erred in his failure to make specific findings to

22  support his determination that the claimant was not credible regarding complaints of excess

23  pain and fatigue.  The court found the reasons given by the ALJ, which included the

24  claimant's daily activities and lack of side effects from medications, were sufficient, stating

25  that "[a]n ALJ is clearly allowed to consider the ability to perform household chores, the lack

26  of side effects from prescribed medications, and the unexplained absence of treatment for

27  excessive pain."  Id. at 750 (citing Bunnell, 947 F.2d at 346; Fair v. Bowen, 885 F.2d 597,

28

24

1    603 (9th Cir. 1989)).

2          Although the ALJ may not have provided his specific reasons underlying his

3    credibility determination in the very paragraph in which he made the ultimate finding, his

4    reasons are readily apparent and specific throughout his decision.  The ALJ discussed

5    Graham's daily activities, lack of side effects from medications, and lack of treatment for the

6    allegedly disabling symptoms throughout his decision.  Specifically, the ALJ stated that he

7    found Dr. Vignola's opinion inconsistent with Graham's admitted activities.  A.T. 19.

8    Second, the ALJ found Graham did not suffer significant side effects from medications.

9    A.T. 18.  Third, the ALJ discredited Dr. Vignola's testimony partly because he found a

10   "nearly complete lack of mental health treatment" on Graham's part.  A.T. 19.  Any such

11   failure to discuss these factors specifically in connection with his finding regarding

12   Graham's credibility therefore constitutes harmless error.

13                                    **CONCLUSION**

14         For the foregoing reasons, the court GRANTS the Commissioner's motion, DENIES

15   Graham's motion, and AFFIRMS the decision of the ALJ.  Specifically, the court finds that

16   (1) the ALJ did not err in determining Graham's RFC; (2) the ALJ's hypothetical included all

17   of Graham's limitations that were supported by substantial evidence; and (3) the ALJ did

18   not err in rejecting Graham's subjective complaints based on her daily activities.

19         This order fully adjudicates the motions listed at numbers 14 and 17 of the clerk's

20   docket for this case.  The clerk shall close the file.

21   **IT IS SO ORDERED.**

22

23   Dated: March 10, 2009

24                                    _____

25                                    PHYLLIS J. HAMILTON
                                      United States District Judge

26

27

28